ST. PAUL, J.
 

 The defendants owned a tract of 7,800 acres of land in Concordia parish, of which 2,000 acres were cleared and under cultivation and 5,800 acres were timbered.
 

 On February 6, 1924, they placed said lands in the hands of plaintiffs for sale for a price of not less than $420,000 net to defendants. The written agreement contained this clause:
 

 “This agreement to remain in effect until April 1, 1924, and if at the end of that time you (plaintiffs) have a good prospective buyer, we (defendants) will extend the time thirty days longer. If we should sell said property, or any part thereof, after the expiration of this agreement, to a buyer with whom you had been negotiating prior to the expiration of this agreement, we will see that you are paid a commission’of five per cent, of, the sale price.”
 

 I.
 

 Plaintiffs immediately began negotiations with the TJtley-Holloway Saw Mill Company, who at once put a “cruiser” on the land for the purpose of estimating the amount of timber thereon. It took some weeks to complete this cruise, but in the end the UtleyI-Iolloway Company declined to buy, and thus pass. out of the case.
 

 II.
 

 Whilst the land was being cruised by the Utley-I-1 olio way Company, plaintiffs got in touch with one Morgan, to whom they intended to offer the lands if their negotiations with the Utley-Holloway Company should fall through.
 

 Morgan informed plaintiffs at once of two things: (1) That the interests with which he was then connected were financially unable to handle the deal and were therefore not interested at all; and (2) that, he himself was not interested at all in the 2,000 acres of cleared and cultivated lands, but that, if he were able to make other financial arrangements (as he thought he could), he might be interested in the timbered lands, arid, upon being asked what he would be willing to give for them, stated that he might be willing to pay $325,000 for the 5,800 acres of timbered lands if his own ijlea of the amount of timber thereon should prove correct. That was all.
 

 III.
 

 Plaintiffs then sought defendants and obtained from them a verbal modification of the contract to the effect that plaintiffs might sell the 5,800 acres of timbered lands alone for a price of $350,000
 
 net
 
 to the defendants.
 

 As this net price was $25,000 above the suggestion (or call it
 
 tentative offer)
 
 made by Morgan, even without taking into consideration the commission which plaintiffs had to get out of the purchaser, it is clear that the proposition could not have been an attractive one to plaintiffs. And accordingly plaintiffs seem to have taken no further interest in that phase of the matter prior to April 1, 1924.
 

 
 *381
 
 IV.
 

 On April 1, 1924 (the day the contract expired), plaintiffs wrote defendants that they were actively engaged in trying to sell the lands and had several parties interested, to some one of whom they felt sure they could sell the lands. They named, among others, the Baxter Timber Company, the company with which Morgan was then connected, and which he had said was not interested in the lands because of financial inability to handle the proposition. And thereupon plaintiffs asked for more time on the contract.
 

 V.
 

 The preponderance of the testimony is that no further time was given. But, be that as it may, 30 days (even 40 days) elapsed, and defendants heard nothing further from plaintiffs. Accordingly, on May 12, 1924, defendants gave an option on said lands, to wit, on the whole 7,800 acres to the Grant Timber Company, with whom plaintiffs had never had any negotiations whatever, for -the sum of $420,000 (being the same
 
 net
 
 price originally mentioned to plaintiffs). But this option was never exercised and was abandoned.
 

 VI.
 

 On July 5, 1924, defendants gave to the Mounger Land Company, of Natchez, a 60-day contract to negotiate a sale of the 5,800 acres of timbered lands for $350,000, agreeing to pay them a commission of $10,000 plus one-half of all above $350,000. And on the same day, or shortly afterwards, Mr. Mounger got in touch with Mr. Morgan, aforementioned, and after some negotiations finally sold the lands, in September, to the Baxter Forest Lands Company, a new corporation formed by Mr. Morgan, but having substantially the same stockholders as the Baxter Timber Company aforementioned. The price agreed upon was $350,000; and the Mounger Company received a commission of 5 peícent. thereon.
 

 VII.
 

 Plaintiffs now seek to recover from defendant a commission of 5 per cent, on the amount of that sale (say $17,500) under that clause of the contract first mentioned, which says:
 

 “If we (defendants) should sell said property, or any part thereof, after the'expiration of this agreement, to a buyer with whom you (plaintiffs) have been negotiating prior to the expiration of this agreement, we will see that you are paid a commission of five per cent, of the sale price.”
 

 Now that clause-is susceptible of but two interpretations: (1) Taken alone, it may mean that, if plaintiffs should have, at any time before the expiration of the contract started negotiations with any person by even so much as offering the property to him, then defendants were to be debarred forever thereafter from selling their property to such person without paying over to plaintiffs 5 per cent, of the price received; or (2) taken in connection with the clause which immediately precedes it, it may mean that, if plaintiffs by their efforts had succeeded in so far interesting some person in the property, that at the expiration of the contract he might be considered a likely buyer, then defendants should still pay the commission on any sale made to him, even though not consummated in the thirty days’ extension provided for in the contract.
 

 But the first interpretation is clearly not admissible. For a contract must represent the will of both parties; and it is inconceivable that any sane person would bind himself in that manner. So that defendants clearly had no intention to bind themselves to that extent. And we do not understand that plaintiffs so contend.
 

 On the other hand, the alternative interpretation is a reasonable and fair one, and hence must be considered as the common intent of the parties. The more so as it is in strict accord with law, even independent of
 
 *383
 
 contract. For this court has always consistently held that a broker who was the procuring cause of a sale would be protected as to his commission against any fraudulent or unfair attempt on the part of his principal to deprive him thereof. Grace Realty Co. v. Peytavin Planting Co., 156 La. 98, 100 So. 62, 48 A. L. R. 1096; Grand Agency v. Staring, 156 La. 1094, 101 So. 723. In the case before us there is however no question of fraud on the part of defendants; for the evidence shows that when they gave their property for sale to the Mounger Company they had no idea who the purchaser might be and (as the result shows) it was with no intent to defraud some one out of a commission since they at once agreed to pay $10,000 as commission and ultimately did bay $17,500.
 

 YIII.
 

 On the other hand, this court has with equal consistency always held that, where a broker has failed to effect a sale, and negotiations have ceased or been broken off, the owner may take up the negotiations where they were left off and himself complete the sale, and the mere fact that the sale may in some degree have been aided by the previous efforts of the broker does not of itself entitle the latter to a commission; i. e., unless it clearly appear that those efforts were in fáct the procuring cause of the sale. Lewis v. Manson, 132 La. 817, 61 So. 835, and authorities there cited; Freeman v. Torre, 157 La. 1093, 103 So. 334.
 

 IX.
 

 The question here involved, therefore, amounts to this, Were plaintiffs the first to interest Morgan in the purchase of the lands sold, and had their negotiations with him progressed so far, at the time the contract expired, that he seemed then a likely purchaser, so that it would be unfair, and contrary to the intent of the parties, that they should be deprived of the fruits of their labor by the mere circumstance that the sale was not complete before the expiration of the extension contemplated by the contract?
 

 But we do not think that the evidence supports that aspect of the ease.
 

 Mr. Morgan was well acquainted with the lands long before plaintiffs became connected with them. In the course of five or six years before that, he had
 
 twice
 
 sought to buy the lands, but they were not for sale. On both occasions he had employed
 
 Mowuger
 
 to purchase the' lands if possible; and so when Mounger, after the lands were put in his hands for sale, sought out Morgan as a possible purchaser, he was not using any information coming from plaintiffs or profiting by any efforts of plaintiffs to interest Morgan in the purchase, but was proceeding entirely on his own information and knowledge.
 

 For the rest, on April 4th, Morgan Wrote his cruiser, G. W. Calhoun:
 

 “I do not believe that it is worth while for us to cruise the Hornshy timber just now [i. e. the defendants’ timber], but if there are later developments on this or other adjacent timber I will advise you promptly.”
 

 So that on April 4th — i. e. three days after-the expiration of the original contract — Morgan Was not then negotiating for the lands. But he must have taken up this matter shortly afterwards; for his cruiser was sent on the land about April 8th and finished about April 26th, making his report to Morgan about May 1st. Hence it was not until 30 days after April 1st that Morgan was even in a position to make an intelligent offer for the property. And the testimony of plaintiffs, is that it was only
 
 after
 
 this timber cruise that Morgan made any serious offer for this timber; and the offer which he did make was only $325,000, which amount defendants wére at all times unwilling to accept, and which offer was never at any time even communicated to them. And Morgan’s testi-» mony is:
 

 “Q. YiUiat, if anything, was said or done by Mr. Thomas or Mr. Bullís to quicken or increase
 
 *385
 
 your interest in this property? A. Very little, if anything. * * *
 

 “Q. Did either Thomas or Bullís, after you received the report of the cruiser, make you any offer for the purchase or sale of the timber prior to May 12th? A. Mr. Thomas told me that $325,000 would not get it, and wanted me to increase my offer. Outside of that there was no discussion of price. * * *
 

 “Q. Did he ever make you a price? A. No; sir.”
 

 Hence our conclusion is: (1) That plaintiffs were not the first to interest Morgan in the lands which, they had for Sale; and (2) that plaintiffs were not negotiating with Morgan during the term of the contract (or even during the alleged extension thereof) in such manner as to interest him as a likely purchaser thereof, or beyond the mere fact of advising him that the land was for sale but could not he purchased for the price which he seemed willing to give for it.
 

 It is our opinion that, when the contract was made, defendants had not in contemplation the payment of a commission for services no more valuable to them than the above.
 

 Accordingly we see no merit in the claim now advanced; and the trial judge was correct in rejecting it.
 

 Decree.
 

 The judgment appealed from is therefore affirmed.