This is a suit by a real estate agent for a commission alleged to be due as the result of a sale by the defendant partnership of a "drugstore" formerly owned and operated by it and which had been listed for sale with the plaintiff real estate agent. Plaintiff also claims attorney's fees as stipulated in the contract.
Defendants excepted to the petition on the ground that the contract with the agent was not signed in the name of the partnership but by one of the individual members in his own name. When this exception and another exception of vagueness were overruled, defendants answered, admitting that a contract had been entered into between one of the members of the partnership and plaintiff and also that the "drugstore" had been sold, but averring that the sale was effected after the expiration of the contract and that the purchaser was some one with whom the agent had not been negotiating during the term of the contract.
It was conceded that the price received was $13,132.86, and that the contract with plaintiff stipulated for an attorney's fee of twenty-five per cent in the event it became necessary to employ counsel.
There was judgment in favor of plaintiff, against defendants, solidarily, for $1641.61, which included the attorney's fees. Defendants have appealed.
Before considering the merits of the case, we shall investigate the effect of the fact that the contract on which the suit is based was signed only by W. J. Kiehm and not in the name of the partnership.
It is obvious that the partnership is a commercial one. Article 2825 of the Civil Code provides in paragraphs 1 and 2 as follows:
"Commercial partnerships are such as are formed:
"1. For the purchase of any personal property and the sale thereof, either in the same state or changed by manufacture. *Page 722 
"2. For buying or selling any personal property whatever, as factors or brokers."
The second paragraph of Article 2872 provides that:
"Commercial partners are bound in solido for the debts of the partnership."
There is no controversy over these questions, but defendants say that since the partnership had nothing to do with the signing of the contract, the partnership is not liable and the other individual partners are not liable.
However, the drugstore was owned and operated by the partnership, the contract for its sale was made on behalf of the partnership, and later when it was sold, it was sold by the partnership. Therefore, we conclude that when W. J. Kiehm signed the contract with plaintiff, he did so on behalf of the partnership.
In Hynes v. Kirkman, 4 La. 47, appears the following:
"Hence, it follows, that as the copartner of the defendant in a mercantile firm, who owned the boat, or as joint owner of a boat, engaged in carrying goods on freight, the defendant was bound in solido with J. Kirkman, for the acts of the latter in relation to the boat. The circumstance of the defendant having engaged the plaintiff as master of the boat, in his, the defendant's, sole name, and not in that of the firm, while the boat was owned by and navigated for the firm, does not prevent the contract being that of the firm, binding both partners, in the same manner as if it had been clothed with the signature of the firm; and susceptible of being affected in its consequences, by the acts of either partner. Kimbal v. Blanc, 8 Mart., N.S., 386, 390."
In Penn v. Kearny, Blois Co., 21 La. Ann. 21, the Supreme Court said:
"In Reynolds v. Swain, 13 La. 193, 197, it was held by this court that where one of the defendants, sued as commercial partners, hired the premises in his individual name, but that the store was occupied until abandonment by the partnership, the latter circumstance showed that the contract was made for the affairs of the partnership, and the firm was therefore bound by the act of the partner, lessee, though made in his individual name."
See, also, Roth v. Moore, 19 La. Ann. 86.
That this principle is recognized in common law jurisdictions is shown by the following quotation from American Jurisprudence, Vol. 40, sec. 152, pp. 237, 238:
"Within the limits allowed by the articles of a general or commercial partnership, and during its continuance, each member has a right to bind his copartners to the performance of every contract he may make in the name of the partnership. A partner cannot, however, bind his copartners beyond such limits. It is not necessary in order to bind a partnership that the contract be signed by all of the partners; a contract signed by one partner having authority, with intent to bind the firm, if so accepted, is binding on the firm.
"To render the partnership liable in case of an ordinary written contract, it is not essential that the name of the firm or partnership be mentioned in the writing. The fact that a contract signed by one partner was a partnership matter may be established by the testimony of the signers. Thus, it may be shown that an obligation under seal executed by all the members of a firm, in and for its business, and for its benefit, binds the firm, although the firm name is not mentioned, and although it appears on its face to be simply the obligation of the partners contracted in their individual names."
The principle is also stated in Corpus Juris, Vol. 47, sec. 304, p. 841, as follows:
"A contract or transaction connected with the firm business and within the apparent scope of such business, in the name of an individual partner, is binding on the firm and all the partners where such individual name has been adopted as the firm name, or where the partners have consented to, or acquiesced in, the use of the individual partner's name in firm transactions. Even where the firm name is different from that of a member, if the contract is intended to be a partnership contract, a partner may bind the firm and other partners by executing the contract in his individual name, * * *" *Page 723 
The drugstore or pharmacy in question was owned by the partnership and was known as Kiehm's Pharmacy. The partnership was composed of Walter J. Kiehm, Norman L. Kiehm and Mrs. Annie Norman, and it was operated by Walter J. Kiehm. The partnership did not own the building or the land on which it was located.
The contract on which the suit is based was signed on March 28th, 1947, and under it the plaintiff, John E. Ruiz, was employed "to find a buyer for the property". It was stipulated that the price would be $25,000.00 cash, or "for any other price, or term hereafter agreed upon * * *." It was also stipulated that if sold the vendor would pay "a commission at the regular rate of 10% on the gross amount" of the sale and that in the event of the necessity of employment of counsel to enforce the contract the vendor would pay twenty-five per cent additional as attorney's fees.
It was provided that the contract should remain effective for thirty days and that during that time it would be exclusive, and it was further stipulated that the commission would be earned by the real estate agent should any contract of sale be made by the owners "within forty-five days after the expiration or termination of this contract, with anyone to whom said property has been quoted, during the term of this contract." It is admitted that the original thirty-day term of the contract with plaintiff had expired on May 23rd, 1947, when the contract for the sale of the property was made by defendants. The sale was actually consummated by the passage of a notarial act on June 4th, 1947, so that it appears that when the sale on which this suit is based was completed the thirty day exclusive period had expired, but the second term of forty-five days had not expired.
As we view the matter, the only question then is whether or not the record shows that the purchaser was someone to whom the property had been "quoted" by the plaintiff or his employee during the exclusive thirty-day term of the contract.
The purchaser was a partnership known as Community Drugstore, the partnership being composed of William J. Montgomery and Robert L. Morris. Morris is a wealthy man who had nothing to do with the actual operation of drugstores, but is shown to have produced most of the funds with which the purchase was made. It appears, too, that he was interested because he desired to secure a place in the building in which his son-in-law, Dr. Johnson, a physician, might conduct his medical practice.
Montgomery formerly operated another drugstore in the same general neighborhood, and the store in question was purchased so that Montgomery, whose lease on his store was about to expire, might operate the newly purchased one.
The contract for the sale of the property, which was entered into on May 23rd, 1947, was made between the Kiehm partnership and Dr. P. J. Johnson, the son-in-law of Morris, and Johnson transferred any rights he might have under that agreement to Montgomery who then, on June 4th, bought the property directly from the Kiehm partnership.
The record shows that neither the plaintiff nor his employee had anything whatever to do with making the contract between the Kiehm partnership and Dr. Johnson. However, it is contended that since the sale to Johnson was not consummated and the sale which was consummated was made directly to Montgomery and Morris, the commission is due, since, according to the contention of plaintiff, his employee, Profumo, had at least "quoted" the property to Montgomery during the thirty day exclusive term of the contract. Ruiz does not claim that he himself negotiated with Montgomery, saying only that his employee, Profumo, who had secured the listing contract, was given authority to negotiate with all prospects. Ruiz, however, did make the following statement concerning negotiations with Montgomery:
"I know very definitely that Mr. Profumo had contacted Mr. William L. Montgomery in connection with the purchase of this property, this pharmacy, on several occasions and there was a bartering as to price. Mr. Montgomery was very desirous of owning or purchasing this property, this pharmacy."
The force of this statement is somewhat lessened by the subsequent statement of Ruiz that he was not present when Profumo *Page 724 
"contacted" Montgomery. However, Ruiz further said that on one occasion he did actually see Profumo in Montgomery's drugstore talking to him, and still later he says that he saw him in conversation with Montgomery on several occasions. Again he said:
"Mr. Montgomery called my office one day in connection with this matter, and I referred him to Mr. Profumo. In fact, he called and endeavored to engage me in conversation pertaining to the sale price and I told him I wasn't familiar with the details and it was customary to have the salesman or my representative that listed the property for sale to handle all details in connection with the sale, and I told him he could call Mr. Profumo or I would have Mr. Profumo call him."
And he says that he gave Mr. Profumo this message.
Profumo says that during the thirty day exclusive term of the contract, he was in almost continuous negotiation with Montgomery, that he quoted him a price of $25,000.00 and on objection that this was too high, he secured a lower one, and that finally he was able to quote a price of "$7500.00 stock and inventory," and that he submitted this to Montgomery. He added that the stock and inventory amounted to about $6,000.00 so that the total price quoted to Montgomery would have been about $13,500.00. The sale, when finally made, was for $13,132.86.
Montgomery vehemently denies that Profumo at any time quoted the property to him. He says that he was not interested in buying the drugstore, but that since he owned a drugstore himself he was interested in knowing the value of other similar stores and that when he asked Profumo what was being asked for the Kiehm Pharmacy, he did so merely to find out what his own might be worth.
Thus it appears from the testimony of Montgomery himself that during the exclusive thirty-day term of the contract he did discuss with Profumo the purchase price which was being asked for the Kiehm drugstore. It is clear also that at that time he was giving thought to building or buying another store and, as a matter of fact, with Morris later bought this very store.
There are other facts about the various conversations between Profumo and Montgomery which lead us to believe that the purchase of the Kiehm Pharmacy was discussed several times between them. Montgomery admits that Profumo was in his store frequently, but he insists that he came in only as a customer and yet he admits that on the first occasion on which Profumo entered his store, he, Profumo, handed him his card. We presume that this means his business card, and we cannot understand why a prospective purchaser who enters a drugstore to make a purchase should hand his business card to the proprietor of the drugstore. Furthermore, he admits that on one occasion he and Profumo and a third person sat and talked over drugstore business for ten or fifteen minutes, but he says that this conversation was limited to prescriptions and matters of that kind.
Under all these circumstances it is asking too much to expect us to believe that his conversations with Profumo were limited to a request for the price that was being asked for the other store so that he might see what stores similar to his were worth.
There is considerable evidence concerning the question of whether or not the names of prospective purchasers or of persons who had been contacted were given by Ruiz to Kiehm at the termination of the thirty-day exclusive period, and it seems to be conceded that the name of Montgomery was not given to Kiehm, but this is explained by the statement that it is not customary for real estate agents to disclose the names of persons with whom they are in contact.
It is interesting to note that before selling the property to Montgomery and Morris, Montgomery was required to sign an affidavit to the effect that it had not been quoted to him by Ruiz or his agent, and it is contended that this shows that Montgomery had not been approached and, furthermore, shows good faith on the part of the vendors. We are somewhat doubtful concerning the effect of this affidavit and we think it just a little suspicious that no affidavit was required from Morris or Johnson that the property had not been quoted to them, and that it was only Montgomery *Page 725 
who was asked to make such an affidavit, he, as a matter of fact, being the only one who, according to the evidence, had been approached by Profumo, the agent of plaintiff. It appears to us that this affidavit evidences a desire to protest a little too much.
We conclude that during the thirty-day exclusive term of the contract, there is no question whatever that Profumo quoted the Kiehm Pharmacy to Montgomery and, in fact, we conclude that he was in active negotiation with him during that period.
Even if it was merely quoted to him by Profumo, we think that under the terms of the contract there would be liability in plaintiff as a result of the ultimate sale to Montgomery. Counsel for defendants contend that there must be more than an actual quoting of the property if there is to be liability; that there must be active negotiation and they cite several cases in each of which it was held that the real estate agent was not entitled to his commission, since his services did not actually procure the purchaser.
But in each of those cases the contract was not an exclusive one. It is unnecessary that we discuss them for the reason already stated that the contract in each of them was not exclusive, and for the further reason that the effect of an exclusive contract during the original term of that contract is of no importance here. The important question here is the effect of that provision of the contract which was effective after the termination of the exclusive period. All counsel realized this and counsel for defendants point with confidence to the decision of our Supreme Court in Bullis Thomas v. Calvert, 162 La. 378, 110 So. 621. There the contract with the agent contained the following stipulation:
" '* * * If we should sell said property, or any part thereof, after the expiration of this agreement, to a buyer with whom you had been negotiating prior to the expiration of this agreement, we will see that you are paid a commission of five per cent. of the sale price.' "
After the expiration of the exclusive term of the contract, the property was sold to a buyer with whom the agent claimed that he had been negotiating. The Supreme Court held that the agent was not entitled to the commission. But we note at once two important distinctions between that case and this. In the first place, in that case in order that the agent be protected it was necessary that the ultimate buyer should be some one with whom he had been "negotiating", which obviously means more than merely quoting a price. And in the second place, in that contract there was no limit of time set upon the second phase of contract. The Court said that if the contract should be interpreted as the agent would interpret it, it would "forever" debar the owner from selling property to anyone to whom the agent had so much as offered it during the original term of the contract, without paying the agent a commission.
Here there is a definite reasonable time limit set upon the second phase of the contract, and here, too, it was not required that there be, during the first phase, anything more than a mere quoting of the property. To quote property surely means nothing more than to offer it and to state the price asked. To negotiate, according to the Supreme Court in Bullis Thomas v. Calvert, supra, means to succeed
"in so far interesting some person in the property, that at the expiration of the contract he might be considered a likely buyer".
We repeat that the record convinces us not only that Profumo had quoted the property to Montgomery but that he had so far interested him that he might be considered a likely buyer.
Under these circumstances, the owners could not sell it to Montgomery or to the partnership in which he was actively interested without rendering themselves liable under the terms of the contract with plaintiff.
We are not prepared to say what might have been the effect had the sale been made in good faith to Dr. Johnson and had he then also in good faith transferred or re-sold the drugstore to Montgomery and Morris. Suffice it to say that that was not done and the sale was made direct from the *Page 726 
partnership to another partnership of which Montgomery was a member.
The amount of the sale is not in dispute, nor is the amount of the attorney's fees.
We regret that we again find it necessary to comment upon the fact that some members of the Bar seem to believe that it is necessary or advisable to direct our attention to certain statements in transcripts by mutilating or defacing the records by underlining certain statements or by drawing pictures of hands pointing to other statements. We consider this practice reprehensible, and we hope that it will be discontinued. We repeat what we said in Mundy v. Ornsby, 14 La. App. 4, 129 So. 177, 178:
"We cannot refrain from commenting on the mutilated condition of the record in this matter resulting from the attempt of one of the attorneys to forcibly call to our attention certain statements in the record. In the judgment of the writer, the underlining of statements specially attractive to one counsel or the other and the making of marks on the margin is highly reprehensible and should be discontinued."
The judgment appealed from is affirmed at the cost of appellants.
Affirmed.