REDMANN, Chief Judge.
Plaintiff building owner appeals from a judgment that (1) rejected his demand for damages and other relief from the rec-ordation of a terminated and then altered $925,000 purchase agreement and (2) awarded a commission on that purchase agreement to brokers Farnsworth Samuel Ltd., plus attorney’s fees. We reverse, and award damages and attorney’s fees to the owner.
The owner had sued the prospective buyer, but the only remaining parties are the owner and the brokers. The brokers intervened in the owner’s suit against the buyer, Smith. So did Gerald Derks, claiming to be Smith’s partner. Plaintiff later sold the property to Smith, Derks and others for $970,000, and dismissed the suit as to them as settled. He then filed a second suit, against the brokers alone. The brokers thereupon demanded commission not on the recorded $925,000 purchase agreement but on the $970,000 sale.
I
The basic issue in this litigation relates to a handwritten clause making the purchase agreement “Subject to seller’s approval of purchaser’s financial statement, said statement to be submitted within 3 days of acceptance of this offer. Seller to indicate his acceptance or not of this statement within 3 days (if audited statement, 24 hours).”
It is undisputed that:
(1) The offer that Farnsworth Samuel presented to plaintiff, with “I” rather than “We” typed into the blank of “_ offer to purchase,” was signed by Rodney Smith alone.
(2) The handwritten clause requiring “purchaser’s” financial statement referred to one purchaser only.
(3) The “financial statement” that Farns-worth Samuel gave to plaintiff, purporting to be of assets and liabilities of that one purchaser (and dated three weeks earlier), was unsigned when presented to plaintiff.
(4) That financial statement listed a substantial net worth of $569,874, but that included an Ohio residence listed at $280,000, and — presumably unavailable to creditors — “deferred income” of $73,-551, leaving only $216,323 that creditors could execute against in Louisiana.
(5) The purchase agreement proposed to extend credit to Smith in the amount of $775,000 (in addition to the $150,000 cash portion of the price). $775,000 is over $200,000 more than Smith’s net worth, and over $558,000 more than Smith apparently had available for execution in Louisiana.
(6) Plaintiff did reject that “financial statement,” and notified Farnsworth Samuel that he rejected it and therefore rejected the agreement that was “subject to” his approval of it, within the three days allowed by the purchase agreement.
(7) Farnsworth Samuel thereafter added the signature of Smith to the financial statement.
(8) Farnsworth Samuel thereafter added the signature of a second purchaser, Gerald Derks, to the purchase agreement.
(9) Farnsworth Samuel thereafter recorded the altered purchase agreement in the Orleans parish conveyance records.
Plaintiff may indeed have wanted to escape from this purchase agreement because he hoped to net more money by another use of the property — may indeed have had that ulterior motive in rejecting the purchaser’s financial statement. The legal question remains, simply, whether he *777 had the legal right to escape from this agreement — whether he could lawfully reject that financial statement.
Farnsworth Samuel was plaintiffs brokers, bound to plaintiff by a listing contract. Farnsworth Samuel, in response to plaintiffs insistence upon evidence of financial responsibility of the offeror whose price was acceptable though mostly credit, wrote the clause in question. That clause made the contract, according to its words, without any qualification, “Subject to seller’s approval of purchaser’s financial statement.” Farnsworth Samuel now argue that plaintiff did not have the legal right simply to withhold approval. Only a lawyer or a real estate agent should have knowledge that the law may read some qualification into that broad language. Farnsworth Samuel, who wrote that language and now seek to recover a commission on the basis that it does not mean what it says, did not share with their client, at the time they had him sign the contract containing that clause, their knowledge that the law may imply some qualification of that language. They should not be allowed to repudiate their own language and now use their unshared knowledge against their client.
But that consideration aside, Farns-worth Samuel cannot recover because the only qualification that the law may imply in the clause “subject to seller’s approval of purchaser’s financial statement” is that the seller should not unreasonably withhold his approval.
It was not unreasonable for plaintiff to withhold his approval (whatever may have been his ulterior motives), because the financial statement shows that Smith, after paying the $150,000 cash portion of the price and acquiring the property worth $925,000 on $775,000 credit, would still not have assets seizable in Louisiana in an amount sufficient to pay plaintiff the $775,-000 that Smith would owe plaintiff (and, in part, plaintiff’s mortgagee to whom plaintiff remained liable) in the event of an uninsured total loss of the building. Although $520,000 of that $775,000 was in the form of the assumption of an existing mortgage, as a matter of law plaintiff would remain liable for that $520,000. Thus plaintiff might suffer a personal loss of $775,000 less the value of the land, rather than a loss of only the $255,000 credit that he personally was extending. It was not mere inquisitiveness that had caused plaintiff to insist upon a clause for financial information about the offeror in the purchase contract in the first place. And, in view of the indisputable risk that plaintiff personally could lose so substantially in the event of the uninsured total loss of the building, one cannot say that it was clearly unreasonable for plaintiff to disapprove Smith’s financial statement and reject his offer under the circumstances.
The trial court’s reasons for judgment mistake the case in saying plaintiff “had every right to refuse to sell to an impecunious prospective purchaser, [but] there is no evidence that Mr. Smith was not able to finance the sale of this property.” Certainly Smith was not impecunious by anyone’s standard, and very probably he could have financed the sale elsewhere. But the purchase contract provided, in effect, that plaintiff-was to be his financier, and for that purpose the contract required Smith’s financial statement for plaintiff’s approval, for plaintiff’s decision as to whether or not he was willing to be Smith’s financier. Plaintiff was not clearly unreasonable in refusing to do so, and plaintiff was not obliged by the contract to allow Smith to find another financier. The contract was, to repeat, “subject to seller’s approval of purchaser’s financial statement” and plaintiff’s disapproval was not an unreasonable or unjustifiable action.
II
Farnsworth Samuel’s solution to the problem of Smith’s reasonably disapprova-ble financial statement was to add to the purchase agreement, after plaintiff had notified them of its termination, a second purchaser, one Gerald Derks. (The complaint that plaintiff “refused [one agent’s] *778 request for more time to satisfy [plaintiff] of Smith’s creditworthiness” is enigmatic. It surely cannot mean that the agent had the right to present a second financial statement of Smith, with increased assets or decreased debts.)
Had Smith and Derks both been the purchasers in the purchase agreement Smith signed, obliging both to submit financial statements for Smith’s approval, Smith could of course not have refused to consider their combined financial statements as a basis for extending $775,000 credit to them. But that is not the question here. The question is not whether plaintiff (for whatever motive) would have had lawful grounds to escape a contract with Smith and Derks, but whether (for whatever motive) he had lawful grounds to escape the contract with Smith alone. Contracts affecting title to immovables must be in writing in order to be enforceable, even between the parties; see La.C.C. 1839. No written contract between plaintiff and Derks ever existed, and Farns-worth Samuel’s self-serving alteration of the contract by adding Derks’s name does not solve the problem of Smith’s reasonably disapproved financial statement and the consequent invalidity of the purchase agreement and nonentitlement to commission of Farnsworth Samuel.
Ill
Farnsworth Samuel also claimed a commission on the theory that they were the “procuring cause” of the later sale by plaintiff to Smith and Derks. Despite some discussion of procuring cause in his reasons for judgment, the trial judge did not base his award on the procuring cause theory. He awarded not 5% of the $970,-000 sale that occurred a year later (to Smith and others), but 5% of the $925,000 sale (to Smith alone) that did not occur. The procuring cause theory is not applicable here because Farnsworth Samuel did not produce a new agreement between the parties but instead assigned to their lawyers the enforcement of the rejected agreement.
“Procuring cause” is a theory devised to provide a basis for compensating a broker who produces a sale without having a listing agreement yet without being a mere intermeddler. The typical case is that of the expiration of the broker’s listing agreement while the broker is negotiating for a sale that the broker’s efforts do produce after the agreement’s expiration. It would be plainly unfair to deny the broker a commission under those circumstances. On the other hand, a broker does not become the owner of the right forever to collect a commission on any sale to anyone to whom he showed the property during the listing agreement’s period; “it is inconceivable that any sane person would bind himself in that manner.” Bullis & Thomas v. Calvert, 162 La. 378, 110 So. 621, 622 (1926). The Louisiana supreme court has
“always held that, where a broker has failed to effect a sale, and negotiations have ceased or been broken off, the owner may take up the negotiations where they were left off and himself complete the sale, and the mere fact that the sale may in some degree have been aided by the previous efforts of the broker does not of itself entitle the latter to a commission; i.e., unless it clearly appear that those efforts were in fact the procuring cause of the sale.” Id. 110 So. at 623.
The broker is thus faced, in the absence of any contractual provision governing a post-contract sale to a buyer whom the broker introduced to the property, with the unwelcome rule of law that the owner may “take up the negotiations where they were left off” and not pay a commission, “unless it clearly appear that [the broker’s] efforts were in fact the procuring cause of the sale.” There is inherent difficulty in proving procuring cause (witness this case, where the trial judge evidently found the broker not the procuring cause of and therefore not entitled to a $48,500 commission on the $970,000 sale, although entitled to a $46,250 commission on the rejected $925,000 sale). To avoid that difficulty, the broker’s standard listing agreement entitles the broker to a commis *779 sion on any sale contract, during a specified reasonable period after the listing expires, that the owner makes with a person to whom the broker “quoted” the property during the listing agreement’s term. A broker whose listing contract has such a provision is entitled to commission on a sale to such a person during that reasonable extension period. But a broker is not entitled to a commission on a sale to such a person after the specified reasonable extension period, “unless it clearly appear that [the broker’s] efforts were in fact the procuring cause of the sale.”
Farnsworth Samuel had a contract listing this property for $1,150,000 cash, on the “Standard Form, Real Estate Board of New Orleans, Inc.” That form provides a 5% commission to the broker
“on the gross amount of any agreement to sell or exchange that may be negotiated during the existence of this contract, or on the gross amount of any such agreement made within 90 days after the expiration or termination of this contract, with anyone to whom said property has been quoted, during the term of this contract. ...”
That contract expired November 11, 1981. The sale on which Farnsworth Samuel bases their “procuring cause” claim occurred August 4, 1982, to Smith and Derks and their wives, apparently as the result of a purchase agreement dated June 25,1982. That was beyond the 90-day period during which Farnsworth Samuel’s own printed listing agreement might have entitled Farnsworth Samuel to a commission.
Farnsworth Samuel did not thereafter by their efforts produce the later sale, for Farnsworth Samuel had alienated plaintiff by their recordation of the lawfully-rejected prior purchase agreement, and they and he were fighting one another in this litigation. The procuring cause argument fails because, as the trial judge necessarily concluded in denying them the $48,500 commission that would have been due if they were the procuring cause of the $970,000 sale, Farnsworth Samuel did not prove that their efforts were the procuring cause of that sale.
IV
We emphasize that this is not the ordinary case of good-faith recordation by a purchaser to make a pending purchase agreement effective in regard to third parties, R.S. 9:2756, either at the time of execution (not a usual practice) or upon the seller’s later wrongful refusal to perform. This is a case of recordation by the brokers for the purpose of forcing the owner to perform (and pay commission on) a purely conditional purchase agreement that the brokers knew had been terminated in accordance with its terms, and that the brokers knew they had thereafter altered, before the brokers recorded it. The brokers attempt to justify their conduct by testifying that plaintiff knew that Smith had “partners” for the purchase. But the brokers’ profession is to deal in land contracts and they know the law requires land contracts to be in writing. They cannot be allowed to enforce a supposed oral land •contract — or to force their client to accept their view of whether a financial statement should be approved — by the “do-it-yourself injunction” of recordation of an altered purchase agreement. They cannot plead ignorance of the law requiring land contracts to be in writing, and they therefore had no legal basis for their position that the terminated plaintiff-Smith agreement was a “perfectly legitimate contract” between plaintiff and Smith and Derks. Farnsworth Samuel were in bad faith in altering and recording the terminated purchase agreement.
Plaintiff is entitled to recover the damages caused by Farnsworth Samuel’s wrongful recordation of the terminated, altered purchase agreement. He argues that the recordation prevented consummation of a sale for at least $1,020,000 through a limited partnership proposed for that purpose. We find the evidence insufficient to prove, as more probable than not, that a sale at that price was defeated by the wrongful recordation. But the wrongful *780 recordation did render unmerchantable (save as to Smith and Derks) plaintiffs title to his $900,000-plus property, effectively depriving him of the right to sell to the general public, for the extended period of this litigation. We conclude that an award of about 1% of the property's value is the minimal reasonable measure of plaintiffs damage from the deliberate wrongful deprivation of his right to sell his property. We therefore award $9,000.
We also award attorney’s fees, in view of the necessity of employing counsel to obtain relief from the wrongful rec-ordation, of the contractual provisions for attorney’s fees (arguably intended by the brokers to entitle only themselves to attorney’s fees), and of the bad-faith, unfair-trade practices (see La.R.S. 51:1405 and 1409) of Farnsworth Samuel climaxed by their “do-it-yourself injunction” of recording the terminated agreement. The trial judge had awarded $7,000 attorney’s fees to Farnsworth Samuel and we deem that an appropriate measure for plaintiff.
Decree
Reversed; judgment for Edwin R. Cross-no against Farnsworth Samuel, Ltd. for $9,000 plus interest from judicial demand, plus $7,000 attorney’s fees and all costs, declaring ineffective the purchase agreement of August 27, 1981, concerning 1133-35-37 Chartres Street, New Orleans, recorded at C.O.B. 774 fo. 74.
REVERSED AND RENDERED.