291 So.2d 495 (1974)
Phillip M. SLEET and Rae A. Donaldson, Plaintiffs-Appellants,
v.
Jewell M. WILLIAMS et ux., Defendants-Appellees.
No. 4471.
Court of Appeal of Louisiana, Third Circuit.
March 12, 1974.
Richard B. Wilkins, Jr., Houston, Tex., for plaintiffs-appellants.
Gist, Methvin & Trimble by James T. Trimble, Jr., Alexandria, for defendants-appellees.
Before HOOD, MILLER and DOMENGEAUX, JJ.
DOMENGEAUX, Judge.
This is a suit for a real estate commission allegedly due from the defendants appellees on a sale of property made by the defendants as the owners thereof. From a judgment in favor of the defendants, the plaintiffs have brought this appeal.
The record indicates the facts to be as follows: In April, 1971, defendants, Jewell M. Williams and his wife Fannie were the *496 owners of a 77.28 acre tract of land located in the Bayou Rapides area of Rapides Parish. Plaintiff, Phillip M. Sleet and his associate Rae A. Donaldson were engaged in the real estate business in the Alexandria area and were doing business under the name of "Phil Sleet, Realtor". Some time in early 1971 an acquaintance of Rae Donaldson through the Reserve Officer's Association, Charles Fine, informed Donaldson of his interest in purchasing real estate on the Bayou Rapides Road for farming and developmental purposes. Donaldson had heard that Jewell Williams was interested in selling some of his property located in the desired area, so some time after the conversation he contacted the Williamses who confirmed an interest in the sale of the property.
It is unclear from the record exactly what transpired during these preliminary conversations concerning the price of the property, any commission to be paid the realtor, any terms of the possible sale, etc. The only definite understanding apparently between the parties was that the defendants wanted the sale to bring them a net of $1,000 per acre. In addition Messrs. Sleet and Donaldson admitted that Mr. Williams flatly refused to sign a listing agreement, then or at any subsequent time.
A short time thereafter Donaldson visited the property with Fine, who indicated an immediate interest in purchasing the tract. Donaldson quoted Fine the price of $85,000 based upon the allowance of an approximate 10% broker's commission, and the net $1,000 per acre desired by the Williamses.
Sleet and Donaldson thereafter met with Mr. Fine and executed a proposed buy and sell agreement on April 18, 1971. The proposed contract was taken to Mr. Williams, but he declined to sign it until Mr. B. Newton, Hargis, his attorney, had reviewed it for him.
The following day, April 19th, the Williamses met with Mr. Donaldson and Mr. Sleet in Mr. Sleet's office and signed an agreement to pay a commission of $7,700 to Donaldson upon a closing of the sale of their property. Defendants allege that this agreement to pay a commission was based solely upon the aforementioned proposed contract to sell the property to Fine.
The property was never sold pursuant to this buy and sell contract because the terms were not agreeable to the Williamses. The defendants were not satisfied with the prepayment or property release clauses, and additionally desired to reserve all of the mineral rights on the property. Thus this contract was never consummated.
Shortly thereafter on May 4, 1971, defendants had their attorney draw up an alternative buy and sell contract containing the modifications they desired. Apparently about this time Charles Fine decided he would take on a partner, Michael M. Wahlder. Wahlder objected to the lack of a prepayment clause and the reservation of mineral rights by the defendants, therefore the second proposed contract to buy and sell was never executed by the purchasers.
Thereafter Mr. Wahlder withdrew as a prospective co-purchaser and Mr. Fine arranged for Mr. Everett Stephens to participate, as purchaser of a ½ interest in the property. An act of sale and mortgage was prepared by Hargis embodying substantially the same terms as the second proposed contract to buy and sell, including the purchase price of $85,000. In May, 1971, Fine and Stephens came to Hargis' office to consummate the sale and Stephens advised that he couldn't sign the note personally but that he would have to take title and appear only through his corporation. In addition Stephens wanted a partnership in commendam arrangement with Fine. The Williamses however insisted that Sephens be personally obligated for payment of the note, and additionally, Fine objected to the proposed partnership arrangement. Negotiations were therefore terminated and the proposed sale and purchase was apparently called off. Fine testified to the effect that he had completely given *497 up on buying the property. No further contact took place between plaintiff realtors and the defendants until November, 1971, when defendants received a letter demanding a commission.
John Cox Moreau, Vice-President of Rapides Bank and Trust Co., subsequently became interested in buying the 77.28 acre tract. He had first obtained knowledge of the property in April, 1971, when Sleet called upon him in his capacity as loan officer in the bank to inquire about the discounting of a $24,000 note which would have been paid under the originally proposed buy and sell agreements. Moreau later learned of the availability of the property from his friend Charles Fine in September or October, 1971, during what appeared to be a casual conversation. Fine related to Moreau the previous history of his negotiations in attempting to purchase the property and the problems encountered in that connection which finally caused the proposed sale to fall through in May, 1971.
Moreau thereupon took the initiative and sometime prior to November, 1971, called Mr. Hargis, who represented defendants in connection with the earlier proposed purchases and asked if the property was still for sale. Hargis therefore contacted the Williamses by mail and negotiations were initiated.
Moreau testified it was originally planned that he and Dr. Joseph Villard would jointly purchase the property but decided a few days before the final sale was to be consummated to give Charles Fine an opportunity to participate. Moreau and Villard had come to this decision out of a sense of fair play towards Fine, inasmuch as he originally had tried, to no avail, to buy the property and additionally because they felt that Fine's knowledge of farming would be of value to the acquisition. Fine testified that until he was contacted in November and given a chance to participate in the sale he had not heard from Moreau since his mention of the property to him several months before.
On November 19, 1971, the property was sold to Moreau, Villard, and Fine for the sum of $77,000, under satisfactory terms to all of the parties concerned. Not only the price but also the terms varied initially from the original proposed contracts with Fine, Wahlder, and Stephens.
It is upon these above facts that plaintiffs filed suit for a commission of $7,700. The district judge ruled that no commission was due for two reasons. First he found that no verbal or written contract of agency existed between the parties at the time of sale. The plaintiffs admitted that no listing agreement was ever signed, and it was the trial judge's opinion that the commission agreement signed by the defendants was intended to apply only to the first transaction between Fine and the Williamses, which was never completed. He further found that even if a tacit contract could be established, which the court found not to exist, the plaintiffs were not the "procuring cause" of the final sale to Moreau, Villard, and Fine.
It is well recognized in our jurisprudence that a realtor's commission on a sale of property is not due if there is insufficient proof of a verbal or written contract of agency between the parties. Bender v. International Paint Company, 237 La. 569, 111 So.2d 775 (1959); Teague v. Ashy, 278 So.2d 516 (La.App. 3rd Cir. 1973); Lowenthal v. Stansell, 135 So.2d 72 (La.App. 2nd Cir. 1961).
However, once a contract of agency is established, the realtor is entitled to his commission, even if the contract is terminated by the seller or has expired by its own terms, if he was the "procuring cause" in a subsequent sale. Munson v. Alello, 199 So.2d 577 (La.App. 1st Cir. 1967); Searcy v. Jacobs, 151 So.2d 166 (La.App. 4th Cir. 1963); Rolston v. Buff, 130 So.2d 732 (La.App. 1st Cir. 1961).
On the question of whether a verbal or written contract of agency existed between the parties, we opine that, at the *498 most, one existed only until May, 1971, when the FineStephens sale fell through. As aforementioned, it is clear that the defendants refused to sign a listing agreement with the plaintiffs throughout all the negotiations with the prospective purchasers, Fine, Wahlder, and Stephens. In addition we note on the face of the commission agreement, signed the day after the original buy and sell contract was drawn up, the following language: "(See attached Contract to Buy and Sell)". Thus it is apparent to this court that said agreement to pay a commission was based upon the prospective sale of the property to Fine for the sum of $85,000. This fact is buttressed by the finding, upon a review of the prospective buy and sell agreement, that the payment provisions specified therein were the same as those contained in the commission agreement. Although this contract was never consummated between the parties, thereafter two contracts, a second buy and sell agreement and later an act of sale and mortgage, were drawn up by the defendants' attorney. Both contained substantially similar provisions as the first buy and sell contract, including a sale price of $85,000, but with terms acceptable to the defendants. Charles Fine was the intended prospective buyer in each of these three transactions, but with a different partner in the last two. However, as noted, the property was not sold under any of the agreements and in May, 1971, negotiations between the plaintiffs, defendants, and Fine were terminated and Fine gave up all hope of becoming a purchaser of the property. Thus, a contract of agency did not thereafter exist between plaintiffs and defendants.
We now turn to the question of whether the plaintiffs were the "procuring cause" of the sale to Moreau, Villard, and Fine on November 19, 1971.
"`Procuring cause' refers to the efforts of a broker in introducing, producing, finding, or interesting a purchaser, and means that negotiations which eventually lead to a sale, must be the result of some active effort of the broker." Womack Agencies v. Fisher, 86 So.2d 732, 734 (La. App. 1st Cir. 1956).
"Procuring cause" is also defined in 12 C.J.S. Brokers § 91, page 208 as follows:
"As used in that branch of the law relating to brokers' commissions, the terms `procuring cause,' `efficient cause,' and `proximate cause' have substantially, if not quite, the same meaning and are often used interchangeably; they refer to a cause originating or setting in motion a series of events which, without break in their continuity, result in the accomplishment of the prime object of the employment of the broker, which may variously be a sale or exchange of the principal's property, an ultimate agreement between the principal and a prospective contracting party, or the procurement of a purchaser who is ready, willing, and able to buy on the principal's terms."
The court in Cobb v. Saucier, 30 So.2d 784, 787 (La.App. 2nd Cir. 1947) summarized the law in this area as follows:
"The facts of this case in a large degree are very much like those of the case of Bullis & Thomas v. Calvert, et al., 162 La. 378, 383, 110 So. 621, 623, wherein the court repeated the legal principles, often theretofore announced by it, controlling in cases of this character, in the following language, viz.: `On the other hand, this court has with equal consistency always held that, where a broker has failed to effect a sale, and negotiations have ceased or been broken off, the owner may take up the negotiations where they were left off and himself complete the sale, and the mere fact that the sale may in some degree have been aided by the previous efforts of the broker does not of itself entitle the latter to a commission; i. e., unless it clearly appear that those efforts were in fact the procuring cause of the sale. Lewis v. Manson, 132 La. 817, 61 So. 835, and authorities there cited, Freeman [& Freeman] v. Torre [Realty & Improvement Co.,] 157 La. 1093, 103 So. 334.'
*499 "It was held in Lewis v. Manson, supra, as reflected from the syllabus, viz.: `If a broker attempts unsuccessfully to effect a sale of land, and his proposed purchaser abandons the idea of buying, but he is afterwards induced to do so by the principal or by another person, without being in any way influenced by the broker, the latter is not entitled to any commission.'
"And in Ford v. Shaffer et al., 143 La. 635, 79 So. 172, the court ruled as follows: `The conditions of a brokerage contract being that the owner of the property is to pay a stipulated commission if the broker effects a sale or procures a purchaser at a stated price, the broker is not entitled to the commission if the owner sells the property without the broker's aid, long after the broker has tried and failed to effect a sale, even though the sale was made to one whom the broker introduced, but failed to interest, as a prospective purchaser.'"
After a careful review of the record, and considering the law and jurisprudence applicable to the facts in this case, we agree with the finding of the trial judge that the plaintiffs were not the "procuring cause" that resulted in the sale of the Williams property on November 19, 1971.
It is clear from the evidence presented that the efforts of Sleet and Donaldson to sell the property ended in May, 1971, when Stephens, Fine, and the Williamses could not get together on terms. John Moreau learned of the availability of the property by virtue of his position at the bank and his friendship with Charles Fine. There was no evidence that he was ever solicited to purchase the property by Sleet, Donaldson, Fine, Everett, Wahlder, or even the defendants. The sale in November, 1971, was brought about solely by the efforts of John Moreau. The fact that Charles Fine perchance became one of the final purchasers cannot alone be enough to allow the plaintiffs to claim their commission. Fine testified that after May, 1971, he had given up any hope of acquiring the property. The evidence preponderates to the effect that he was not later contacted about the sale of the property by the plaintiffs or the defendants. It was only after his initial discussion with Moreau that Moreau subsequently contacted him in November, 1971, some six months after Fine's last contact with Sleet or Donaldson, to participate in the sale. Thus it is clear that the plaintiffs had no active part in the final sale to Moreau, Villard, and Fine.
For the above and foregoing reasons the judgment of the trial court is affirmed at plaintiffs-appellants' costs.
Affirmed.