442 So.2d 1346 (1983)
Carl W. JACKSON, d/b/a Carl W. Jackson Real Estate and Insurance Agency, Plaintiff-Appellant,
v.
Henry Claude FREE and Iva Peavy Free, Defendants-Appellees.
No. 83-401.
Court of Appeal of Louisiana, Third Circuit.
December 14, 1983.
Baggett, McCall, Ranier, Robert C. McCall, Lake Charles, for plaintiff-appellant.
Levingston, Tynes & Liles, David L. Levingston and Henry R. Liles, Lake Charles, for defendants-appellees.
Before GUIDRY, FORET and KNOLL, JJ.
FORET, Judge.
Carl W. Jackson d/b/a Carl W. Jackson Real Estate and Insurance Agency (plaintiff) brought this action to recover a real estate commission allegedly owed to him under the terms of a listing agreement. Named defendants are Henry C. Free and his wife, Iva Peavy Free. After trial on the merits, the trial court rendered judgment *1347 in favor of defendants, dismissing plaintiff's demands against them.
Plaintiff appeals and raises the following issues:
(1) Whether the trial court erred in failing to find that, under the terms of the listing agreement, plaintiff was entitled to receive a commission on the sale of certain immovable property by defendants to a third party.
(2) Whether the trial court erred in finding that plaintiff was not the "procuring cause" of said sale.

FACTS
There is no dispute regarding the following facts. Plaintiff is a licensed real estate broker. On January 5, 1978, plaintiff and defendants entered into a contract whereby plaintiff was to attempt to sell certain immovable property (the property) owned by defendants. That contract contained the following pertinent provisions:
"...
In consideration of your agreement to list the property herein described and to use your efforts to find a purchaser, I hereby grant you the exclusive right for 365 days from date hereof and thereafter until you receive from me a 15 day written notice terminating this agreement to sell (a description of the property and the terms under which it was to be sold follows)........"
"...
If said property is sold before the expiration of this agreement, by myself, or any other person, I agree to pay you a commission of 10% if it be sold within twelve months after such expiration to any person with whom you have had negotiations, I agree to pay you a commission of 10%."
("You" and "yours" refer to plaintiff, while "I" and "myself" refer to defendants.)
On March 21, 1978, plaintiff received a written "OFFER TO PURCHASE" the property from Glenn Alexander. This written offer provided that Alexander would make a down payment of $30,000 cash, and execute a promissory note made to defendants in the amount of $52,000, bearing interest at the rate of 7¼ per annum from date, and payable in monthly installments of $354.74. However, these figures were scratched out in the written document containing Alexander's offer, and the down payment was changed to $38,000 cash, with the balance of $44,000 to be represented by a promissory note identical in all other respects to the one mentioned above. The initials HCF appear by these changes and another change reserving the mineral rights, etc., to both of the defendants rather than to Mr. Free alone. Alexander rejected this counter-offer.
Nothing further happened regarding the property until February 7, 1980, when defendants sold the property to Alexander and his wife (the Alexanders) under the same terms as those contained in the original "OFFER TO PURCHASE" made by Alexander. Upon learning of this sale, plaintiff filed the instant suit, alleging that he was entitled to a commission on the sale.

EXISTENCE OF LISTING AGREEMENT
Plaintiff contends that the trial court erred in failing to find that he was entitled to a commission on the sale of the property. As noted above, the listing agreement was entered into by plaintiff and defendants on January 5, 1978. The agreement granted plaintiff the exclusive right to use his efforts to find a purchaser for the property for 365 days after the date on which the agreement was executed, and thereafter until plaintiff received from defendants a 15-day written notice terminating the agreement. Plaintiff argues that the trial court erred in finding that defendants had sent such a notice.
Plaintiff testified that he never received written notice from defendants, terminating the listing agreement. On the other hand, Mrs. Free testified that she did mail a letter to plaintiff to that effect. A copy of that letter was introduced in evidence. Mrs. Free stated that she sent the letter to plaintiff after Mr. Free consulted with an *1348 attorney, and that the letter contained the exact language suggested to Mr. Free by this attorney. She further stated that the letter was mailed to plaintiff on December 15, 1978.
Mr. Alexander, who is also an attorney, testified that Mrs. Free showed him the listing agreement, and asked him how long it would be in effect. She also told him that defendants wanted to terminate the agreement. He then told her that she needed to write a letter to plaintiff in which she would give him written notice to terminate the agreement. However, she told him that she had already done this after consulting with another attorney. Alexander stated that this conversation took place around the end of 1978.
The trial court noted the above testimony and the evidence showing that defendants filed a written complaint against plaintiff with the Greater Calcasieu Board of Realtors on March 29, 1978, in which they alleged that plaintiff failed to tell them that he would be due a commission on the sale of their property, even if it were sold to someone whom defendants had contacted before entering into the listing agreement. The trial court then found that Mrs. Free had written the above mentioned letter to plaintiff, giving him written notice to terminate the listing agreement. We agree with the trial court's finding. Thus, the listing agreement was terminated at the end of the primary period. This was long before the property was sold to the Alexanders.
We must now determine what, if any, effect the extension clause contained in the listing agreement had on plaintiff's alleged right to receive a commission on the sale of the property. The extension clause provides that,
"... if it [the property] be sold within twelve months after such expiration [of the listing agreement] to any person with whom you [plaintiff] have had negotiations, I [defendants] agree to pay you a commission of 10%."
We have already found that the listing agreement expired on January 5, 1979. Thus, the extension clause was no longer in effect on February 8, 1980, when the property was sold to the Alexanders, and plaintiff was not entitled to a commission on that sale by virtue of said clause.
Further, as noted in Harkey v. Gahagan, 338 So.2d 133 (La.App. 2 Cir.1976), on page 135:
"The purpose of the extension clause in a real estate listing contract is to insure the realtor's right to a fee when the property owner sells the property subject to the listing after the expiration of the primary term to a purchaser who had been located or otherwise interested in the property by the realtor's effort. The realtor does not have to be the procuring cause in order to activate the extension clause. He need not have been involved in active negotiation with the purchaser at the time of the expiration of the primary term. However, his activities must have been the cause of creating some minimal interest in the purchaser which contributed to bringing about the eventual sale." (Emphasis ours.)
In the next section of this opinion, we find (as did the trial court) that plaintiff's activities in no way contributed to the sale of defendants' property to the Alexanders. Thus, even if we were to find that the extension clause was in effect on the date of said sale, plaintiff would not be entitled to receive a commission.

"PROCURING CAUSE" DOCTRINE
Plaintiff contends that, even if the extension clause of the listing agreement had expired at the time of the sale, he would still be entitled to collect a commission under the "Procuring Cause" doctrine. He argues that the trial court erred in finding that he was not the party responsible for arranging the sale.
Generally, a real estate broker is entitled to a commission if he is the "procuring cause" of a sale, even though the term of his listing agreement may have expired. Sleet v. Harding, 383 So.2d 122 (La.App. 3 Cir.1980); Cramer v. Guercio, *1349 331 So.2d 550 (La.App. 1 Cir.1976)[1]; Sleet v. Williams, 291 So.2d 495 (La.App. 3 Cir. 1974); Hamberlin v. Bourgeois, 289 So.2d 358 (La.App. 1 Cir.1973).
"Procuring cause" refers to the efforts of a broker in introducing, producing, finding, or interesting a purchaser, and means that negotiations which eventually lead to a sale must be the result of some active effort of the broker. Harkey v. Gahagan, supra; Sleet v. Williams, supra; Womack Agencies, Inc. v. Fisher, 86 So.2d 732 (La.App. 1 Cir.1956); Lehmann v. Howard, 49 So.2d 453 (La.App. 2 Cir.1950).
The term "procuring cause" is defined in the following language from 12 C.J.S. Brokers, § 91, pg. 208, which was quoted with approval in Sleet v. Harding, supra, and Sleet v. Williams, supra:
"As used in that branch of the law relating to brokers' commissions, the terms `procuring cause', `efficient cause', and `proximate cause' have substantially, if not quite, the same meaning and are often used interchangeably; they refer to a cause originating or setting in motion a series of events which without break in their continuity, result in the accomplishment of the prime object of the employment of the broker, which may variously be a sale or exchange of the principal's property, an ultimate agreement between the principal and a prospective contracting party, or the procurement of a purchaser who is ready, willing, and able to buy on the principal's terms."
As the above language suggests, in order to establish that his efforts were the procuring cause of a sale, the broker must show more than the mere fact that his actions in some way aided the sale. Sleet v. Harding, supra; Cramer v. Guercio, supra; Bullis & Thomas v. Calvert, 162 La.378, 110 So. 621 (1926).
Plaintiff testified that, after entering into the listing agreement, he put a sign on defendants' property and began calling prospective purchasers. He stated that he was contacted by Alexander, who told him that he was interested in purchasing the property. Plaintiff then prepared an "AGREEMENT TO PURCHASE AND SELL", but Alexander failed to sign it. However, Alexander prepared an "OFFER TO PURCHASE" which he sent to plaintiff, who then brought it to defendants. Plaintiff testified that he made the changes, noted above, in the terms of this agreement, and that Mr. Free initialed these changes. The document was then mailed to Alexander, but he never signed it. Plaintiff was unable to secure any other written offers to purchase defendants' property.
Under cross-examination, plaintiff admitted that he knew that defendants had been discussing the purchase of their property with an adjacent property owner, prior to the time that plaintiff and defendants had entered into the listing agreement. However, he denied that he knew that this person was Alexander.
Plaintiff's wife testified that she was present when the listing agreement was signed. She admitted that Mrs. Free told her that Alexander had expressed an interest in buying defendants' property prior to that time. Both plaintiff and his wife admitted that Mr. Free had signed the counteroffer made to Alexander on March 21, 1978, and that defendants gave no indication that they would not pay plaintiff his commission if Alexander accepted the counteroffer.
Alexander testified that he and his wife purchased 33 acres of land adjacent to defendants' property in 1974, and it was at this time that they became acquainted with defendants. He stated that he had discussed the possibility of purchasing defendants' property with them several months before they entered into the listing agreement. He further stated that the terms contained in his "OFFER TO PURCHASE" were identical to those that had been mentioned in his discussions with defendants. He had related these terms to plaintiff, *1350 who also incorporated them into the "AGREEMENT TO PURCHASE AND SELL" drafted by him.
Alexander stated that he and his wife had bought an old home located in Lake Charles in 1976, and that they tore it down with the intention of rebuilding it on their property located adjacent to defendants' property. In 1979, they were living in Cameron, which is approximately 45 miles from the property they had purchased. Because of the substantial distance involved in driving to and from their home in Cameron, they decided that they needed a home to live in that was closer to the building site. It was sometime in 1979 that they were contacted by Mr. Free, who made a proposal to them. The terms of the proposal were that the Alexanders would lend defendants $30,000 without interest (to be secured by a mortgage on property owned by defendants in Vernon Parish), and defendants would allow the Alexanders to live in their home (which was adjacent to the Alexanders' property) without having to pay rent. The Alexanders agreed to this proposal as there had been some vandalism at the site where they were rebuilding the old home.
Alexander stated that, at the time this arrangement was made, there was no agreement whatsoever between himself and defendants that the $30,000 would later become a down payment toward the purchase of defendants' property. He further stated that there was no agreement between himself and defendants to wait until the listing agreement had expired before they would enter into a sale of defendants' property, nor did defendants ever indicate to him their intention to avoid paying plaintiff his commission.
On February 8, 1980, defendants sold their property to the Alexanders. Alexander testified that, approximately one week before this, he was contacted by Mr. Free, who once again discussed the possibility of selling the property. The Alexanders' building project had turned out to be a great deal more expensive and time-consuming than what they had expected, and they had reached what Alexander termed the middle point of that project. Alexander stated that he and Mr. Free discussed the purchase of defendants' property under the identical terms of the "OFFER TO PURCHASE" he had made to them approximately two years earlier. Alexander testified that there was no agreement regarding the sale of defendants' property to him until approximately one week before the actual sale took place, and that negotiations regarding the terms of the sale continued until the time that the vendor's lien was executed. When the sale was finally consummated, the Alexanders simply canceled the promissory note given them by defendants for the $30,000 loan that had been made to them.
Mrs. Free corroborated the testimony given by Alexander regarding the $30,000 loan, and the circumstances surrounding the eventual sale of the property. She denied any intent to deprive plaintiff of his commission. She explained that defendants borrowed $30,000 from the Alexanders because this was the amount needed by the contractor to begin construction on defendants' new home in Vernon Parish. This money was placed in a separate account, and was paid to the contractor at certain intervals as construction on defendants' home progressed. She stated that the money was borrowed from the Alexanders because defendants were able to obtain it without having to pay interest on it.
It is our opinion that the trial court correctly found that plaintiff was not the "procuring cause" of the sale of defendants' property to the Alexanders. As noted by the trial court, the sale to the Alexanders,
"... resulted not from Mr. Jackson's [plaintiff's] efforts but from contacts made with Mr. Alexander long prior to Mr. Jackson's involvement and contacts that were continued at least subsequent to December 15, 1979, if that date would be considered the date on which a letter *1351 [Mrs. Free's letter terminating the listing agreement] was mailed ...".[2]

DECREE
For the above and foregoing reasons, the judgment of the trial court is affirmed.
All costs of this appeal are assessed against plaintiff-appellant.
AFFIRMED.
NOTES
[1] See Cramer v. Guercio, 336 So.2d 908 (La.App. 1 Cir.1976), for a dissenting opinion.
[2] See Bullis & Thomas v. Calvert, supra; Harkey v. Gahagan, supra; and Coppage v. Camelo, 330 So.2d 695 (La.App. 4 Cir.1976), for cases involving facts and circumstances similar to those present in the case sub judice, and the application of the "procuring cause" doctrine in light of such facts and circumstances.