42 So.3d 1116 (2010)
TEC REALTORS, INC. d/b/a Coldwell Banker Commercial TEC Realtors
v.
D & L FAIRWAY PROPERTY MANAGEMENT, L.L.C., Alfred B. Dempsey, and Shearn N. Lemoine.
No. 2009 CA 2145.
Court of Appeal of Louisiana, First Circuit.
July 9, 2010.
*1118 Richard A. Richardson, Mandeville, LA, for Plaintiff-Appellant, TEC Realtors, Inc. d/b/a Coldwell Banker Commercial TEC Realtors.
Sam J. Collett, Jr., Bailey Dirmann Morse, Covington, LA, for Defendants-Appellees, D & L Fairway Property Management, L.L.C., Alfred B. Dempsey, and Shearn N. Lemoine.
Before PARRO, KUHN, and McDONALD, JJ.
KUHN, J.
Plaintiff, TEC Realtors, Inc., doing business as Coldwell Banker Commercial TEC Realtors ("TEC"), brought this suit against defendants, D & L Fairway Property Management, L.L.C. ("D & L"), Alfred B. Dempsey, and Shearn N. Lemoine, to recover a real estate commission allegedly owed to it under the terms of a listing agreement, along with attorneys' fees and costs.[1] Plaintiff and defendants respectively each filed a motion for summary judgment. On August 17, 2009, the trial court signed a judgment, denying plaintiffs motion for summary judgment, granting defendants' motion for summary judgment, and dismissing plaintiffs claims with prejudice at its cost. Plaintiff has *1119 suspensively appealed the trial court's judgment. We reverse that portion of the judgment that granted the defendants' motion for summary judgment and dismissed plaintiffs claims with prejudice at its cost, and we remand this matter for further proceedings.[2]

I. PROCEDURAL AND FACTUAL BACKGROUND
On October 2, 2006, Dempsey and Lemoine entered into an "Exclusive Listing Contract for Lease of Property" (the "Stirling listing agreement") with Stirling Property, Inc. ("Stirling") as broker for a term of one year, commencing September 25, 2006, and ending September 25, 2007. The parties do not dispute that Dempsey and Lemoine acted on behalf of D & L, in its capacity as either lessor and/or owner of the property subject to the listing agreement, a commercial condominium, located in Mandeville, Louisiana. In the Stirling listing agreement, Thomas F. Danos was designated by Stirling as one of the "Lessor's Designated Agent[s]."[3] According to one of Danos' affidavits, during the term of this listing agreement, the subject property was submitted to Pontchartrain Surgery Center, L.L.C. ("Pontchartrain"). On behalf of the defendants, Danos negotiated with William Barrois, also an agent of Stirling, who represented Pontchartrain, but no agreement was reached.[4] According to Dempsey's affidavit, Barrois introduced Pontchartrain to D & L and started the lease discussions. Dempsey's affidavit conceded that Danos was an agent for Stirling during the term of the Stirling listing agreement, but Dempsey asserted therein that Danos had nothing to do with the introduction or procurement of Pontchartrain as a lease prospect.
On or about January 26, 2007, Danos terminated his relationship with Stirling and placed his real estate agent's license with TEC. According to Danos' affidavit, the Stirling listing agreement was terminated by agreement between him and Stirling.[5] A new "Exclusive Listing Contract *1120 for Lease of Property" (the "TEC listing agreement") was entered into between TEC as "Broker" and Dempsey and Lemoine as "Owner[s]" regarding the subject property. The term of the TEC listing agreement commenced February 5, 2007, and ended on March 5, 2007. This agreement provided, in pertinent part, as follows:
The Lease(s) shall be on the following terms:
$22.00 PER SQ. FT + NNN
INCLUDING $30 P.S.F BUILDOUT
...
2. If a lease is negotiated and executed covering said property, during the term of this contract, or within 365 days after the expiration of this contract with any party to whom Broker has submitted said property during the term of this contract (or any affiliate, nominee or representative of such party), Owner agrees to pay to Broker a commission as set forth below on all gross rents covering said property. This commission shall be earned and paid for services rendered if, during the Term: (a) All or any portion of the Property is leased to a tenant (by Broker, Owner, or anyone else); (b) A tenant is procured (by Broker, Owner, or anyone else) who is ready, willing and able to lease the Property on the terms above stated, or on any other terms agreeable to Owner; (c) Any contract for the lease on all or any portion of the Property is entered into by Owner; or (d) Owner removes the Property from the market.
3. Commission to be paid by Owner/Lessor. Said commission shall be payable upon final execution of a lease between Owner and a Tenant, equal to the following rates:

Primary Term: 6%

Renewal Options: 5%
According to Dempsey's affidavit, after the TEC listing agreement was executed, Danos continued discussions on behalf of D & L with Barrois, who remained the Stirling agent representing Pontchartrain, in hopes of consummating a lease between Pontchartrain and D & L. According to Danos' affidavit, the subject property "was submitted to [Pontchartrain] through its agent, Barrois, by [Danos] and negotiations continued. Specifically, [he] and Barrois negotiated over the terms" of the lease. Ultimately, the TEC listing agreement terminated without D & L and Pontchartrain consummating a lease agreement.
On March 16, 2007, Dempsey and Lemoine signed an "Exclusive Listing Contract for Lease of Property" pertaining to the subject property with Gulf States Real Estate Services of Louisiana, L.L.C. ("Gulf States"). The term of this agreement commenced on March 15, 2007, and ended March 13, 2008, and provided that as "Owner[s]", Dempsey, Lemoine, and D & L agreed to pay Gulf States a commission pursuant to the terms of the listing agreement "[i]f a lease is negotiated and executed covering [the subject property], during the term of this contract or within 180 days after the expiration of this contract...." The listing agreement further provided, "Broker designates and Lessor accepts `Patrick Graffagnino' as the `Lessor's Designated Agent.'"
Dempsey's affidavit further states, in pertinent part, that 1) Gulf States, through *1121 Graffagnino, continued negotiations on behalf of D & L with Pontchartrain and its agent, Barrois; and 2) neither TEC nor Danos were involved in any discussions between D & L and Pontchartrain after the TEC listing agreement terminated. On April 26, 2007, D & L and Pontchartrain executed a "Commercial Lease Agreement" for a term of 120 months, "commencing the earlier of September 1, 2007 or upon completion of Lessee's improvements."[6] D & L also granted Pontchartrain two renewal options, each to extend the lease for a period of five years. According to Dempsey's affidavit, D & L paid a total commission of $69,097.71, which was divided as agreed upon by Gulf States and Stirling.
Based on the information provided in the above-referenced affidavits and the terms of the TEC listing agreement, the trial court found that TEC's motion for summary judgment was not well-founded, i.e., that it was not entitled to a commission under its listing agreement, and the trial court granted defendants' motion for summary judgment, dismissing TEC's claims with prejudice.
In written reasons for judgment, the trial court found that "D & L, TEC, and [Pontchartrain] discussed the possibility of leasing the subject property during the effective period of the TEC listing agreement." The court concluded, however, that TEC was not the procuring cause of the final lease agreement and that TEC was not entitled to a commission under the terms of the extension clause in the TEC listing agreement. In addressing the language of the extension clause, the court determined that the two sentences in paragraph 2 of the TEC listing agreement must be read in conjunction with one another, reasoning as follows, in pertinent part:
After a careful reading of the entirety of paragraph two ..., the Court finds that the first sentence merely sets forth the parameters of the extension clause: "if a lease is negotiated and a contract executed... within 365 days after the expiration of this contract with any party to whom Broker has submitted said property during the term of this contract...." The second sentence describes the various conditions under which the commission shall be paid if, during the term, one of the described events occur.
... If a lease is negotiated and a contract executed within 365 days after the expiration of the contract with any party a Broker has already submitted during the term of the contract, then the commission shall be paid if any one of the four events (a-d) occurred during the term of the listing agreement. None of these events occurred in the instant case. No lease was negotiated and confected during the term. The subject property was not leased to a tenant during the term. A tenant was not "procured" who was ready, willing and able to lease the property on the stated terms or any other terms. No contract of lease was entered into during the term, and the owner did not remove the property from the market during the term. Therefore, the Court finds that no event occurred which would trigger the [extension clause or] tail provision in the TEC listing agreement and entitle TEC to a commission. This finding is based on the unambiguous terms of TEC's own listing agreement.
In accordance with these reasons, the trial court signed a written judgment, denying TEC's motion for summary judgment, granting defendants' motion for *1122 summary judgment, and dismissing TEC's claims with prejudice. TEC has appealed the trial court's judgment, urging that the trial court erred in interpreting the unambiguous provisions of paragraph 2 of the TEC listing agreement.

II. ANALYSIS
In the instant case, TEC does not claim to be the procuring cause of the lease confected between D & L and Pontchartrain. Rather, TEC bases its claim on the extension clause of its listing agreement. TEC asserts it is entitled to collect a commission because: 1) the event described in its listing agreement, a lease of the subject property, occurred during the extension period, i.e., within 365 days after the expiration of its listing agreement; and 2) the lease was executed with Pontchartrain, a party to whom TEC had submitted the property during the term of its listing agreement. TEC asserts it need only meet the requirements of the first sentence of paragraph 2 to be entitled to its commission, urging that the second sentence covers situations not covered by the first sentence and that the second sentence expands rather than limits the situations in which it is entitled to a commission.
Defendants respond that neither TEC nor Danos was the procuring or consummating agent for the Pontchartrain lease, and the "procuring cause doctrine" eliminates TEC's right to recover any commission. In their brief, defendants urge the following facts to support their legal contention:
While at Stirling, [Danos] had nothing to do with ... Pontchartrain's introduction. [Danos] then moved his agency to TEC and a new listing agreement was signed by D & L with TEC. TEC did nothing during its brief 30 day listing term but unsuccessfully continue negotiations with the lease prospect originally procured by Stirling.

Defendants assert that based on the second sentence of paragraph 2 of the TEC listing agreement, in order for TEC to recover a commission, TEC was required to procure a tenant "ready, willing and able" to lease the subject property on the terms provided in the TEC listing agreement or on other terms agreeable to D & L. Defendants urge that the terms of the Pontchartrain lease are significantly different than the terms outlined in the TEC listing agreement. Further, defendants argue that none of the "qualifying situations set forth in the second sentence of paragraph 2" of the TEC listing agreement occurred. Defendants also contend it would be a preposterous result for TEC to recover a commission based on its extension clause, resulting in defendants' obligation to pay multiple commissions.

A. Procuring Cause Doctrine and Extension Clauses
Generally, a real estate broker is entitled to a commission if it has been a "procuring cause" of the transaction. See Creely v. Leisure Living Inc., 437 So.2d 816, 820 (La.1983). This general principle has been recognized even where the term of the broker's listing agreement has expired. See Cramer v. Guercio, 331 So.2d 550, 552 (La.App. 1st Cir.1976); see also Jackson v. Free, 442 So.2d 1346, 1348 (La. App. 3d Cir.1983).[7] Our jurisprudence has defined "procuring cause" as:

*1123 a cause originating or setting in motion a series of events which, without break in their continuity, result in the accomplishment of the prime object of the employment of the broker, which may variously be a sale or exchange of the principal's property, an ultimate agreement between the principal and a prospective contracting party, or the procurement of a purchaser who is ready, willing and able to buy on the principal's terms.
Creely, 437 So.2d at 820-21, and cases cited therein. Thus, in order to establish that his efforts were the procuring cause of a sale, a broker must show more than the mere fact that his actions in some way aided the sale. Sleet v. Harding, 383 So.2d 122, 124 (La.App. 3d Cir.1980).[8]
Under the terms of an extension clause, however, a realtor may be entitled to recover a commission even if he is not a procuring cause of the transaction at issue.
In a typical real estate brokerage contract, generally referred to as a "listing agreement," the broker undertakes the obligation of finding a buyer ready, willing, and able to purchase the described property for the price specified or on any other terms acceptable to the seller. If the broker accomplishes this within the listing period, he is entitled to a commission, normally expressed as a percentage of the price obtained. Unfortunately for brokers, sellers have proven to be extremely resourceful in devising schemes to avoid paying the agreed commissions. One common ploy has been the owner's refusal to accept the buyer's offer during the listing period, only to accept a similar offer from the same buyer shortly after the period has expired. Louisiana courts have been quick to find that under such circumstances the commission has nonetheless been earned, since the broker was in fact the "procuring cause" of the sale.
In order to afford the broker even greater protection, most listing agreements include an extension clause (sometimes referred to as a "protection clause"). The extension clause generally provides that if, within some designated period after the expiration of the listing agreement, the property is sold to a person with whom the broker has carried on some designated activity during the listing, the commission is to be paid. Thus, two time periods are discernible: the listing period and a subsequent extension period. The extension clause itself delineates what must transpire between the broker and the eventual purchaser for the commission to be collectable. But, in any event, the presence of the extension clause should prevent the broker from having to meet the rigid standard of having been a "procuring cause" of the sale.
...
Thus, the broker's right to his commission should be based on whether the contractual provision of the extension clause in question has been satisfied....
John M. Norwood and Cornelius J. Hyde, Extension Clauses in Louisiana Listing Agreements, 42 La. L.Rev. 1011, 1011-1012 (1982)(footnote omitted).
In the instant case, defendants urge that the terms of the extension clause require TEC to be a procuring cause in *1124 order to collect a commission. For the reasons that follow, we find no merit in this contention.

B. TEC's Extension Clause
The clause at issue in TEC's listing agreement provides:
2. If a lease is negotiated and executed covering said property, during the term of this contract, or within 365 days after the expiration of this contract with any party to whom Broker has submitted said property during the term of this contract (or any affiliate, nominee or representative of such party), Owner agrees to pay to Broker a commission as set forth below on all gross rents covering said property. This commission shall be earned and paid for services rendered if, during the Term: (a) All or any portion of the Property is leased to a tenant (by Broker, Owner, or anyone else); (b) A tenant is procured (by Broker, Owner, or anyone else) who is ready, willing and able to lease the Property on the terms above stated, or on any other terms agreeable to Owner; (c) Any contract for the lease on all or any portion of the Property is entered into by Owner; or (d) Owner removes the Property from the market. [Emphasis added].

1) General Principles of Contractual Interpretation
Generally, legal agreements have the effect of law upon the parties, and, as they bind themselves, they shall be held to a full performance of the obligations flowing therefrom. Boh Bros. Const. Co., L.L.C. v. State ex rel. Dep't of Transp. and Dev., 08-1793, p. 4 (La.App. 1st Cir.3/27/09), 9 So.3d 982, 984, writ denied, 09-0856 (La.6/5/09), 9 So.3d 870. The interpretation of a contract is the determination of the common intent of the parties. La. C.C. art. 2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046. The words of a contract must be given their generally prevailing meaning. La. C.C. art. 2047. A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective. La. C.C. art. 2049. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, and the conduct of the parties before and after the formation of the contract. La. C.C. art. 2053.
The first sentence of paragraph 2 addresses two different time periods"during the term" and "within 365 days after the expiration of this contract." The parties do not dispute that if during the term of the contract, February 5, 2007, through March 5, 2007, a lease had been negotiated and executed covering the subject property, the defendants would have been obliged to pay TEC a commission as specified in the contract. The parties do not agree, however, on the interpretation that should be afforded to the extension clause or that portion of the first sentence of paragraph 2, which provides that "Owner agrees to pay ... a commission" if "within 365 days after the expiration of this contract," a lease is negotiated and executed "with any party to whom Broker has submitted said property during the term of this contract." (Emphasis added.)
Defendants urge that the first sentence is modified by the second sentence of paragraph 2. The second sentence provides that the broker's commission shall be *1125 earned if one of four events occurs during the term of the contract, including a lease of all or a portion of the property by the broker or anyone else; procurement of a "ready, willing, and able" tenant; the owner entering into any contract for the lease of all or any portion of the property; or the owner removing the subject property from the market. Such a provision protects a broker from being precluded from recovering a commission in the instance that an owner might lease his property, contract to lease his property, or otherwise remove his property from the market during the term of the listing agreement. Further, a broker might otherwise be precluded from recovering a commission if the broker finds a tenant who is ready, willing, and able to lease the property on the terms stated in the listing agreement, but the owner decides not to lease the property to the tenant. The second sentence addresses events such as these that might occur "during the term" of the listing agreement and makes no reference to the 365-day period of the extension clause.
Interpreting each sentence in light of the other sentence, we find that the first and second sentences of paragraph 2 must be read independently of each otherin other words, if the contingencies of a particular sentence are met, the commission is authorized. Because the first sentence references two distinct time periods, i.e., the contract term and the extension period, and the second sentence references only the contract term, it is impossible to interpret the second sentence as modifying the first sentence without nullifying the reference to the extension period in the first sentence. Further, when the sentences are interpreted independently of one another, the contractual provisions logically authorize the recovery of a commission for the broker based on certain contingencies as set forth in each sentence.
We also reject defendants' interpretation of the second sentence of paragraph 2 as requiring TEC to establish it was a procuring cause or as requiring TEC to prove that the Pontchartrain lease was made on the same terms as those specified in the TEC listing agreement. TEC's commission claim is governed by the provisions of the TEC listing agreement, which does not provide that the commission is dependent on the broker's actions being the procuring cause or on specific lease terms. In order to activate the extension clause in this case, the broker does not have to be the procuring cause since the terms of the extension clause did not require such conduct. Further, to be entitled to recover a commission under the terms of this extension clause, TEC was not required to have been involved in active negotiations with Pontchartrain when the primary term of the listing agreement expired. See Harkey v. Gahagan, 338 So.2d 133, 135 (La.App. 2d Cir.1976).

2) "Submitted"
In the instant case, the extension clause provides that the commission is dependent on the fact that the broker "submitted" the property during the term of the TEC listing agreement to the tenant who leased it during the extension period.[9] *1126 The listing agreement provides no definition of the term "submitted." Webster's Third New International Dictionary 2277 (3d ed.1993) defines "submit," in pertinent part, as "to send or commit for consideration, study, or decision." The American Heritage Dictionary of the English Language (4th ed.2009), defines "submit," in pertinent part, as "to commit (something) to the consideration or judgment of another."
The parties do not dispute that Barrois rather than Danos introduced Pontchartrain to D & L. The facts do not establish whether Danos "showed" the subject property to Pontchartrain during the term of the TEC listing agreement. However, during the term of the TEC listing agreement, Danos continued discussions on behalf of D & L with Barrois, according to Dempsey's affidavit. Danos' affidavit also states that during the term of the TEC listing agreement, he and Barrois negotiated the terms of the lease. Regardless of the terminology used, i.e., discussions or negotiations, the affidavits establish that a consideration of terms related to the subject property occurred during the term of the TEC listing agreement. As such, we conclude that Danos' negotiations or discussions with Barrois pertaining to the subject property necessarily entailed a submission of that property to Pontchartrain. Thus, we find Danos' conduct during the term of the TEC listing agreement was sufficient to satisfy the requirement of TEC "submitting" the property to Pontchartrain during the term of the TEC listing agreement.

3) "Minimal Causal Connection"
In Harkey, the court affirmed the denial of a realtor's claim for a commission, where a sale occurred approximately five months after the listing agreement had expired but during a twelve-month extension period.[10]Id. at 133. The realtor claimed he had "submitted" the property under the terms of the extension clause to a party who ultimately purchased the property, based on his sole conduct of telephoning the purchaser during the listing period and informing him of the property listing and its terms after the owner had advised the realtor that the party had earlier expressed an interest in the property. Id. at 134-35. In addressing the language of the extension clause, the court reasoned as follows:
The purpose of the extension clause in a real estate listing contract is to insure the realtor's right to a fee when the *1127 property owner sells the property subject to the listing after the expiration of the primary term to a purchaser who had been located or otherwise interested in the property by the realtor's effort. The realtor does not have to be the procuring cause in order to activate the extension clause. He need not have been involved in active negotiation with the purchaser at the time of the expiration of the primary term. However, his activities must have been the cause of creating some minimal interest in the purchaser which contributed to bringing about the eventual sale.
...
Here, the purpose of the clause and the parties' intent was that [the realtor] would be entitled to his commission if, following the elapse of the primary term, a sale was made by [the owner] to a prospect in whom [the realtor], by his activities, had created some minimal interest which contributed to the eventual sale....
Id. at 135-137.
Further addressing the facts of the case, the Harkey court found that the purchaser was familiar with the listed property prior to the execution of the listing agreement and the telephone call to him by the realtor; the purchaser had made an identical offer to purchase the property some time prior to the listing contract; the purchaser, upon receipt of the realtor's telephone call, had quickly expressed no interest in the property; and more than one year had elapsed between the purchaser's receipt of the telephone call from the realtor and his negotiations and purchase of the exact property at the exact price he had earlier offered to the owner. Id. at 137-38. Based on these facts, the court found there was neither a connexity nor a minimal causal relationship between the realtor's activity during the primary term of the listing agreement and the ultimate sale of the property, and thus, the realtor was not entitled to recover a commission based on the terms of the extension clause. Id. at 138.
In Gertrude Gardner, Inc. v. Bryant, 446 So.2d 451, 452 (La.App. 4th Cir.), writ denied, 450 So.2d 358 (La.1984), the specified activity of the extension clause required the realtor to "quote" the property during the term of the listing agreement. The court found that while the listing agreement was in effect, the broker's real estate agent held an "open house," during which she showed the house to the eventual purchasers, "told them the price," and provided advertising materials concerning the house. Id. The Bryant court found that the real estate agent's conduct at the open house constituted a "quotation of the property." Id. at 453. But the Bryant court followed Harkey in further requiring some minimal causal relationship or connexity between the broker's activity during the listing period and the sale/lease of the property subject to the extension clause. Id. In addressing Harkey, the court stated, "Commentators have read the Harkey case to `require the broker to prove two things in order to recover his commission under the extension clause: (1) that he carried on the kind of activity specified in the extension clause, and (2) that the activity created some minimal interest in the purchaser which contributed to the eventual sale.'" Id. The Bryant court concluded that the real estate agent's efforts "contributed to creating at least a minimal interest in [the ultimate purchasers] in buying the house." Id.
However, we note that the Third Circuit rejected the Harkey minimal interest requirement in Tammariello Properties, Inc. v. Medical Realty Co., Inc., 549 So.2d 1259 (La.App. 3d Cir.1989), finding the requisite *1128 contact referenced in the extension clause had occurred. Id. at 1263. Based on the wording of an addendum to the contract, the court concluded that the parties had not intended to require the broker to create a "minimal interest" in the buyer in order to be entitled to a commission.[11]But see Jackson, 442 So.2d at 1348, wherein the Third Circuit had previously cited Harkey's minimal interest test.
This circuit has not previously addressed whether the broker is required to prove that his efforts had some minimal causal connection to the subject real estate transaction to recover pursuant to an extension clause. In deciding whether to impose this requirement, we consider the purpose of the extension clause, as discussed in Harkey, i.e., as insuring the realtor's right to a fee when the property owner sells the property subject to the listing, after the expiration of the primary term, to a purchaser who had been located or otherwise interested in the property by the realtor's effort. Harkey, 338 So.2d at 135. To hold that a broker is entitled to collect a commission where his efforts had no minimal causal connexity to the real estate transaction for which he seeks to collect a commission would be contrary to the underlying purpose of the extension clause. Accordingly, to recover a commission under the extension clause of the TEC listing agreement, we find TEC must establish a minimal causal connection between its action of "submitting" the property to Pontchartrain during the term of the TEC listing agreement and the ultimate lease confected between D & L and Pontchartrain. Although we have found Danos' discussions/negotiations during the term of the TEC listing agreement satisfied the extension clause requirement of TEC "submitting" the property to Pontchartrain, the evidence in the record does not establish whether Danos' discussions/negotiations had a minimal causal connection to the lease that was ultimately confected with Pontchartrain approximately seven and one-half weeks after the TEC listing agreement ended.
A motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). Summary judgment is favored and shall be construed to secure the just, speedy, and inexpensive determination of every action. La. C.C.P. art. 966(A)(2).
The initial burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial, he need not negate all essential elements of the adverse party's claim, but he must point out that there is an absence of factual support for one or more elements essential to the claim. La. C.C.P. art. 966(C)(2). Once the movant has met his initial burden of proof, the burden shifts to the non-moving party to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden at trial. See Id.; Samaha v. Rau, 07-1726, p. 5 (La.2/26/08), 977 So.2d 880, 883. The non-moving party may not rest on mere allegations or denials, but must set forth specific facts that show that a genuine issue of material fact remains. If the non-moving *1129 party fails to meet this burden, there is no genuine issue of material fact, and the movant is entitled to summary judgment as a matter of law. Berry v. Paul Revere Life Ins. Co., 08-0945, p. 6 (La.App. 1st Cir.7/9/09), 21 So.3d 385, 388, writs denied, 09-2220 & 09-2241 (La.12/18/09), 23 So.3d 942 & 945; see La. C.C.P. art. 966(C)(2). A fact is material if it potentially insures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of the legal dispute. Samaha, 07-1726 at p. 6, 977 So.2d at 884 (quoting Hines v. Garrett, 04-0806, p. 1 (La.6/25/04), 876 So.2d 764, 765).
With respect to the defendants' motion for summary judgment, defendants bore the initial burden of proof. Because defendants would not bear the burden of proof at trial, they did not need to negate all essential elements of TEC's claim, but they were required to point out that there was an absence of factual support for one or more elements essential to TEC's claim. In support of their motion for summary judgment, defendants submitted the various listing agreements; the commission agreement executed between D & L, Gulf States, and Stirling; and Dempsey's affidavit. Dempsey's affidavit referenced Danos' continued discussions with Barrois on behalf of Pontchartrain during TEC's listing agreement, but the affidavit does not address the nature or scope of these "discussions." Thus, we cannot determine whether TEC's conduct during the term of its listing agreement constituted activity that created some minimal causal connection that contributed to the eventual lease with Pontchartrain.
Although plaintiff must establish the "minimal causal connection" to support its claim for a commission, defendants failed to point out the absence of factual support for this element of plaintiff's claim and thereby failed to meet its initial burden of proof under La. C.C.P. art. 966(C).[12] Accordingly, a genuine issue of material fact remains as to this issue, and defendants have not established they are entitled to judgment as a matter of law.

4. Multiple Commissions
Defendants further urge that, as owners, they should not be liable for multiple commissions, citing Cramer, 331 So.2d at 553. In Cramer, two realtors, who were doing business as Cramer & Cadenhead Realtors, filed suit to recover a commission under the terms of a listing agreement, whereby owners of a house listed it for sale at the price of $53,000. Id. at 551. During the 90-day listing period, a sales representative for the plaintiff realtors (realtor # 1) held an open house to show the house to prospective purchasers. Through this means the purchasers learned the property was for sale. Id. Before viewing the house, the purchasers contacted a personal friend and realtor (realtor # 2) who provided them with the specifications of the house, according to information provided in a multiple listing service. Id. After viewing the house, the purchasers made an oral offer through realtor # 1, which the owners refused. Following another open house later that month, the owners also refused a second written offer by the purchasers in the amount of $42,500. Id. Thereafter, the exclusive listing of the house with plaintiffs' agency expired, and the owners listed the property with another realty firm (realtor # 3). Id. Realtor # 2 in cooperation with realtor # 3 submitted a written offer of $46,000 on behalf of the purchasers, that offer was accepted by the property *1130 owners, and the sale to the purchasers followed within six months of the expiration of the initial listing agreement. Id. at 551-52. Realtor # 1 sued to recover the commission allegedly due them. The trial court rejected the plaintiffs' claim, and this court affirmed, reasoning that plaintiffs had not established they were the procuring cause of the sale to the purchasers. Id. at 552-53.
The Cramer court further rejected plaintiffs' assertion that they were entitled to a commission since the sale had occurred within six months of the expiration of the listing agreement, which provided, in pertinent part:
"I/We further agree to pay commission as above stipulated in event of sale of said property by Me/us within six months after the expiration of this agreement, provided purchaser has become interested in said property as a result of the efforts of advertising of said agent during the active term of this listing, and I/We also agree to refer all prospects to the listing Realtor."
Finding this language to be ambiguous, the Cramer court considered parol evidence by witnesses in the real estate profession, who testified that "the purpose of this clause was to prevent an owner from contacting a prospective purchaser after the listing had expired so as to deprive a listing realtor of his commission and that the clause had no application to a real estate agent operating under a valid listing." Id. at 553. In dictum, the Cramer court further stated:
Serious consequences to a good faith property owner will result if the six-month clause is applicable to an owner's duly authorized real estate broker. A property owner listing a house with a realtor could possibly be liable for a double commission or even additional commissions if he subsequently changes realtors after the initial listing expires and the property is sold within six months thereafter by the new listing realtor to someone who had been interested in the property by the first realtor or who had submitted an offer, although far less than the ultimate sales price of the property. To say the least, sanctioning such a result is an absurdity, and that would be the precise result here if we require the good faith property owners in the instant case to pay a double commission.
Id. Ultimately, the Cramer court construed the ambiguities of the contract against the plaintiffs/realtors who had prepared the contract, and the court concluded that the six-month clause did not authorize recovery based on the facts presented therein. Id. at 554-55.
We find Cramer distinguishable from the facts of the instant case, and we find it does not preclude recovery of a commission by TEC. Here, we find no ambiguity in the language of the extension clause, and no parol evidence was offered by defendants to support their contention that TEC should be precluded from recovering a commission.[13] The contract provisions are clear and must be enforced as written. Parties are free to contract for any object that is lawful, possible, and determined or determinable. La. C.C. art. 1971. The defendants, as commercial property owners, and TEC, as broker, were free to frame their agreement as they saw fit and to make the broker's commission dependent on whatever conditions they agreed on so long as such conditions *1131 were not unlawful or contrary to public policy. The mere fact that a contract may work a hardship on one of the parties does not authorize a court to set it aside. Englemann v. Auderer, 10 La.App. 136, 121 So. 194, 195 (La.App.Orl.1929). It is not the province of the courts to relieve a party of a bad bargain, no matter how harsh. Sunrise Const. and Dev. Corp. v. Coast Waterworks, Inc., 00-0303, p. 7 (La. App. 1st Cir.6/22/01), 806 So.2d 1, 5, writ denied, 01-2577 (La.1/11/02), 807 So.2d 235. Defendants could have contracted to preclude TEC's recovery under the terms of the extension clause in the event that the property was subject to an agreement with another broker. But based on the language of the contract, we find no basis not to enforce it as written. See Alex F. Dreyfus Co., Inc. v. Friedman, 171 La. 90, 92-93, 129 So. 679, 679-80 (1930).
Because we find an outstanding genuine issue of material fact and because we are not reviewing that portion of the trial court judgment that denied plaintiffs motion for summary judgment, we do not reach the issues of whether TEC is entitled to recover a commission and, in the event that it ultimately establishes such an entitlement, whether TEC is entitled to recover all or a portion of the commission designated in its listing agreement.

III. CONCLUSION
Based on the record before us, defendants have not established they are entitled to judgment as a matter of law; a genuine issue of material fact exists as to whether there was a minimal causal connection between TEC's action of "submitting" the property to Pontchartrain during the term of the TEC listing agreement and the ultimate lease confected between D & L and Pontchartrain. Accordingly, we reverse that portion of the trial court's judgment that granted the defendants' motion for summary judgment and dismissed plaintiffs claims with prejudice at its cost, and we remand this matter for further proceedings consistent with this opinion. Appeal costs are assessed against defendants-appellees.
REVERSED IN PART AND REMANDED.
PARRO, J., concurs and assigns reasons.
McDONALD, J., concurs.
PARRO, J., concurring.
I agree with the finding that the defendants have not established that they are entitled to a summary judgment as a matter of law. Therefore, I believe that the trial court judgment should be reversed and that this matter should be remanded to the trial court for further proceedings.
I do not dispute that, to recover a commission under the extension clause of the TEC listing agreement, TEC must establish a minimal causal connection between a finding that it "submitted" the property to Pontchartrain during the term of the TEC listing agreement and the ultimate lease confected between D & L and Pontchartrain. Furthermore, I agree that a genuine issue of material fact exists as to whether there was a minimal causal connection between TEC's efforts and the lease with Pontchartrain. However, in light of the evidence offered, I also believe that a genuine issue of material fact exists as to whether TEC "submitted" the property to Pontchartrain during the term of the TEC listing agreement.[1] Therefore, I *1132 would remand for further proceedings on this issue as well. Accordingly, I respectfully concur.
NOTES
[1] D & L is wholly owned by its managing members, Dempsey and Lemoine.
[2] We note that the portion of the trial court's judgment that granted the defendants' motion for summary judgment and dismissed plaintiff's claim is appealable. Because the denial of a motion for summary judgment is an interlocutory judgment, the portion of the judgment denying plaintiff's motion for summary judgment is not appealable. La. C.C.P. arts. 1841 and 2083; Louisiana Power and Light Co. v. Slaughter, 04-2361, p. 6 (La.App. 1st Cir.11/4/05), 917 So.2d 532, 536, writ denied, 06-0217 (La.4/24/06), 926 So.2d 550. We decline to exercise our supervisory jurisdiction to review that portion of the trial court judgment that denied plaintiff's motion for summary judgment. Our court has addressed interlocutory issues on the appeal of a partial final judgment when they are "identical" to the issues raised in the appeal. See Dean v. Griffin Crane & Steel, Inc., 05-1226, p. 4 n. 3 (La.App. 1st Cir.5/5/06), 935 So.2d 186, 189 n. 3, writ denied, 06-1334 (La.9/22/06), 937 So.2d 387; Louisiana Power and Light Co., 04-2361, p. 7; 917 So.2d at 536. However, the issues raised in plaintiff's motion for summary judgment are not identical to the issues raised by the defendants' motion. In particular, in order for plaintiff to establish that it is entitled to judgment as a matter of law, it must establish the amount of the commission and attorneys' fees due under the terms of the contractissues not reached by the trial court.
[3] The Stirling listing agreement designated "Joe Kramer, Matt Organ and Tom Danos" as "Lessor's Designated Agent[s]."
[4] According to Barrois' affidavit, he was designated by Stirling and accepted by Pontchartrain as its designated agent in connection with its negotiations and the subsequent lease of the property from D & L.
[5] The Stirling listing agreement included an extension clause, which provided that Dempsey and Lemoine agreed to pay to the broker a commission as specified in the contract if a lease was negotiated and a contract executed covering the subject property within 365 days after expiration of the contract "with any party to whom Broker has submitted said property during the term of this contract."
[6] Under the terms of the lease, D & L was not responsible for any "buildout" costs.
[7] "In the absence of an extension clause ... the broker's claim is based on a theory of quantum meruit; the owner should not be allowed to avail himself of the efforts of the broker without paying a fair compensation." John M. Norwood and Cornelius J. Hyde, Extension Clauses in Louisiana Listing Agreements, 42 La. L.Rev. 1011, 1013 (1982).
[8] The procuring cause doctrine can provide a basis for recovery when no extension clause is present in the listing agreement or it may provide a basis for recovery independent of the extension clause. Steven K. Mulliken, When Does The Seller Owe The Broker A Commission? A Discussion of the Law and What it Teaches About Listing Agreements, 132 Mil. L.Rev. 265, 283 (1991); see Creely, 437 So.2d at 820; Jackson, 442 So.2d at 1348.
[9] Extension clauses used in listing agreements vary widely in their terminology, requiring different types of conduct on which the broker's right to a commission is based. For example, a commission might be due "provided purchaser has become interested in said property as a result of the efforts or advertising of said REALTOR;" if a sale/lease is confected "with anyone to whom said property has been quoted" or "with anyone to whom said property was shown or submitted by anyone (or with whom negotiations involving said property had been carried on)." Norwood and Hyde, 42 La. L.Rev. at 1012. See also J.R. Kemper, Annotation, Construction of Provision in Real-Estate Broker's Listing Contract that Broker Shall Receive Commission on Sale After Expiration of Listing Period to One With Whom Broker has "Negotiated" During Listing Period, 51 A.L.R.3d 1149, 1181 (1973) ("[P]erhaps the [extension clause] most frequently employed is the word `negotiate,' or some form thereof, such as `negotiated with' or `had negotiations with.'").

The parties to a listing contract are "free to frame their agreement in whatever terms they may see fitprovided that such terms are neither unlawful nor contrary to public policy and that in so doing they may make a broker's right to compensation depend upon the happening of a designated event, or upon the fulfillment of a particular set of circumstances, rather than upon the procurement of a purchaser." Id. at 1168.
[10] The Harkey listing agreement provided, in pertinent part:

"This employment and authority shall continue for the period of twelve (12) months from date hereof. I agree to pay said agent 6% Percent of the selling price as and for the compensation of said agent hereunder in the event of a sale or an exchange of said real property by said agent or by any other agent or person, including myself, while this contract is in force, or if sold or exchanged within twelve (12) months after termination to anyone with whom said agent or owner had negotiated or to whom this property had been shown or submitted prior to the termination...."
Harkey, 338 So.2d at 135.
[11] The extension clause authorized the collection of a commission "[i]f, after the expiration of this agreement, owner sells the property to any person who had contacted owner directly or had been introduced to the Property by Broker ... during the time hereof or to any person with whom Broker ... has had negotiations for such sale." Tammariello Properties, Inc., 549 So.2d at 1262-63.
[12] As discussed above, in supporting its motion for summary judgment, defendants erroneously urged they were entitled to judgment because TEC had not established it was the procuring cause of the Pontchartrain lease.
[13] We also note that neither the TEC listing agreement nor any of the other listing agreements pertaining to the subject property contained a provision that precluded recovery under an extension clause if the property was subsequently listed with another broker.
[1] Under the facts presented in this case, I find the conclusion that Danos's continued "negotiations" and "discussions" with Barrois during the term of the TEC listing agreement necessarily entailed a submission of that property to Pontchartrain to be questionable. It appears that the inclusion of the phrase "Broker has submitted said property during the term of this contract" in the extension clause of the TEC listing agreement is ambiguous, requiring further consideration of its meaning on remand of this matter. See LSA-C.C. arts. 2045-2057. For example, how many times may one property be "submitted" to the same prospective lessee or purchaser? Under the holding of this case, there were three submissions of the property to Pontchartrain.